Columbia Bank, Respondent, vs. Morgan, Appellant.

*March 5—April 2, 1929.*

Crownhart and Eschweiler, JJ., dissent.

*L. C. Gunderson,* attorney, and *Geo. B. Parkhill,* of counsel, both of Madison, for the appellant.

For the respondent there was a brief by *Hill, Thomann & Beckwith* of Madison, and oral argument by *A. J. Thomann.*

DOERFLER, J.  It is conceded that the amount owing by Markgraf to the defendant was paid out of the assets of the bank; that the check delivered by Markgraf to the defendant was not deposited in the bank, and that the amount thereof was not charged to his account.  The actual transaction that took place at the bank on the 31st day of March, 1924, did not appear upon the records of the bank.  When the examination of the bank's books was made in September, 1924, it was discovered that Markgraf had embezzled funds of the bank prior to defendant's loan to him, and that he had also been guilty of embezzlement of large amounts during the period subsequent thereto.  But none of the officers ·or directors of the bank, and in fact no one outside of Markgraf himself, had any knowledge whatsoever of the latter's peculations.  An examination of the transactions between Markgraf and the defendant clearly indicates that these transactions were the product of a corrupt mind, and were designed to appropriate assets of the· bank for the personal benefit of the perpetrator.  The payment of the sum of $500 and interest on his note for $2,000 prior to the maturity of the note, in view of all the facts and circumstances in the case, was designed to inspire confidence in the defendant as to the personal integrity of Markgraf; but here it must be noted that this was not a transaction in which the bank was in any manner interested, but that it constituted a personal and individual one between the immediate parties thereto.  On the 31st day of March, 1924, when Markgraf delivered his personal check to the defendant, his note with respect to the balance owing thereon was overdue and unpaid, and the defendant called at the bank with her note at that time, for the express purpose, namely, of demanding and receiving the amount due her.

There is no evidence in the case from which it may be inferred that the directors of the bank or the stockholders thereof had given Markgraf authority to pay his personal

obligations with the funds of the bank, and without such authority it is clear that he could not lawfully do so. Such authority is created either by express or implied agreement. Such authority may be implied from conduct which indicates that the directors and officers of the bank had previously acquiesced in acts of a similar. nature. A cashier of a bank has no more authority to appropriate the funds of the bank for the payment of his private obligations than has an officer of a business corporation the right to appropriate the assets of his corporation for his individual benefit. If such authority be recognized with respect to a bank, the institution would soon lose its popularity, and the faith and trust which depositors should have therein would soon vanish. A bank is a *quasi*-public institution. The well-being of a bank does not merely concern the stockholders, but the public at large, and the wrongdoing which an officer of a bank might be guilty of might lead to financial disaster involving the entire local public. From a situation such as we have attempted to describe arose a further doctrine, that one dealing with a bank must be presumed to know the usual and ordinary authority of the cashier of the bank, who is the principal executive officer thereof. *Williams v. Dorrier,* 135 Pa. St. 445, 19 Atl. 1024.

The lower court found that the defendant acted in good faith and that she had no knowledge that she was receiving in payment of her note the funds of the bank.

The case of *Hier v. Miller,* 68 Kan. 258, 75 Pac. 77, is relied upon by plaintiff's counsel herein as being one similar to the case at bar. The facts in the case are briefly summarized in the opinion, and they are as follows:

"The cashier of a bank organized under the laws of this state [Kansas] was allowed the sole charge and conduct of its affairs by its board of directors. He was indebted individually to a depositor of the bank and upon different occasions pretended to make payments upon such indebtedness by giving the depositor credit upon her pass-book. Such

credits were not shown upon any of the memoranda of the bank's business, and were not entered upon its books. The last transaction of this character occurred upon November 30, 1900. A final settlement was then had between the depositor and the cashier, resulting in the surrender to him of his last unpaid note and an entry upon her pass-book as before. She then demanded her balance in the bank. The cashier balanced her pass-book, she drew a check for the amount shown by the pass-book to be due her, and he gave her therefor a cashier's draft upon the bank in St. Joseph, Missouri, which was afterwards duly paid and returned. No officer of the bank had actual knowledge of the true character of these transactions except the cashier. The depositor herself acted in good faith. On January 16, 1901, the death of the cashier occurred. The bank was then found to be insolvent, was immediately taken in charge by the bank commissioner, and in due time a receiver for it was appointed. Because the books of the bank did not disclose the personal transactions of the cashier with the depositor, her account appeared to be overdrawn when the receiver assumed control. The amount of the overdraft following the affair of November, 1900, was somewhat reduced by deposits subsequently made by third parties to the depositor's credit, and the receiver sued for the balance appearing to be due when he took charge. From the facts found the district court concluded that the cashier had no authority to pay his individual debts to the depositor by giving her credit in the bank and permitting her to draw checks upon it without his having received anything of value therefor; that the entries of credit upon the depositor's pass-book were acts beyond the scope of the cashier's power; and that, because nothing appeared upon the books of the bank to give notice of the facts, the bank was not bound. Judgment was rendered for the receiver, and the depositor asks a review of these conclusions of law."

The court in substance held that the cashier had no authority to enter the credits above referred to upon the pass-book of the defendant, because the cashier had made no deposits to the credit of the defendant in the bank, and because no entries appeared in the books of the bank indicating such

credits; that in honoring the checks of the defendant based upon the credits appearing upon the pass-book the cashier was appropriating to his own use the funds of the bank; that the cashier had a right to dispose of the funds of the bank for purposes contemplated by its charter; and it is said in the opinion:

". . . But he could not absorb the funds of the bank in the satisfaction of his private debts without an express and especial authorization. The office of cashier does not import such power. Whether or not such authority actually did exist the defendant was bound to inquire. . . . When the cashier made an entry in the defendant's pass-book of the receipt of money by the bank, she knew the recital was false, for she had delivered to the bank nothing of value at all. She knew that something more must be done before she could rightfully demand the payment of her checks. She knew very well that the money was yet to be supplied, and that, unless funds actually were furnished, there was nothing which she could have any right to withdraw. No obligation rested upon the bank, or upon any of the officials as such, to deposit or to transfer funds to the credit of her account. She was required to do that herself or to see that it was done. If she depended upon her debtor to act for her, it was incumbent upon her to see that he did whatever was required. . . . She had no right to ask the bank to return to her money which she never deposited, and which it never in fact received from any source; and when it paid her checks without any money belonging to her in its possession to meet them, it was entitled to be reimbursed."

It is further held in the decision in the *Hier Case, supra,* that it makes no difference that the creditor had no knowledge of the misappropriation. The facts in the *Hier Case* as above disclosed are similar in some respects to those in the case at bar, but there are marked differences. The only written evidence in the *Hier Case* consisted of the entries made in the pass-book. The defendant undoubtedly assumed that the cashier had deposited to the credit of her account the various amounts drawn out by her by checks, but she had no actual knowledge whether this had been done or not. Under

these circumstances, what was her duty in the premises in relation to her obligations which she owed to the bank? Either the bank was bound to lose this money or she would be bound to do so. Both the bank and the defendant were innocent with respect to any wrongdoing. The result of the transaction was that the defendant received the moneys of the bank, which in equity and good conscience belonged to it, and for which it received no consideration. The bank and its officers, with the exception of the cashier, had no knowledge whatsoever, up to the time of the appointment of a receiver, that the funds of the bank had been misappropriated, because no entries were made or appeared upon the books of the bank. To say the least, the defendant, under the there existing circumstances, could have made inquiry from either the other officers of the bank or from the directors upon the subject; and this she failed to do. *Grady v. Pink Hill Bank & Trust Co.* 184 N. C. 158, 113 S. E. 667.

In the case at bar there was not only a credit upon the pass-book, entered by the cashier, but there were entries upon the bills receivable ledger which indicated that the amount of the defendant's note to the bank had been paid. There was, however, no entry in the books of account of the plaintiff charging the cashier with the sum of $1,540; in fact, no one in connection with the bank, excepting the cashier himself, had any knowledge whatsoever of the personal transaction between the cashier and the defendant. The entries made upon the books of the bank, while not representing the true transactions between the cashier and the defendant, and between the defendant and the bank, did indicate that the sum of $1,540 was actually disbursed by the bank, and in order to produce a tally of the assets there was fraudulently included in the same a forged note of Bessie Madigan in the amount last above named. There was thus an ingenious and successful scheme devised and executed for the express purpose of screening the fraudulent transactions of the cashier.

We have been unable to ascertain from the evidence the manner in which the bank examiner discovered the fraud of the cashier, and it is quite apparent to us that the only way in which such fraud could be discovered would be by canvassing the individuals (and among them Bessie Madigan) to determine the genuineness of the bills receivable. Evidently the bank examiner must have had some suspicion with respect to the affairs of the bank, for the evidence discloses that Markgraf was present on the first day of the examination and then disappeared for a number of days, and thereafter returned, and when the true state of affairs was discovered he committed suicide. The record also discloses that none of the other officers of the bank, or any of the directors, had any suspicion of the wrongdoings of the cashier; on the contrary, the latter was held by all in the highest confidence.

Another marked distinction existing between the facts in the instant case and those in the *Hier Case* consists of the fact that Markgraf, in payment of his note to the defendant, delivered to her his personal check, which was indorsed by her, but was never delivered to the bank. Considering, however, these marked differences, the outstanding fact existed in both cases that the cashier, in order to pay his individual indebtedness to his creditor, appropriated not his own money but the money of the bank. We have, therefore, in this case, as in the *Hier Case,* two innocent parties. In each case the creditor received moneys to which, in equity and in justice, she was not entitled, and the bank's funds were used, not in satisfaction of a claim owing by it, but an individual claim owing by the cashier. What has heretofore been said with respect to who must suffer under such circumstances, in the *Hier Case,* is equally applicable to the instant case.

Defendant's counsel relies principally upon the decision in the case of *Pope v. Ramsey County State Bank,* 137 Minn.

46, 162 N. W. 1051. In the *Pope Case,* under circumstances similar to those existing in the instant case, the court distinguished between the individual check of the cashier, drawn upon his own account in the bank, and that of a cashier's check, a certified check, and a draft. In that case it is said:

"The first mentioned [meaning the check] creates no liability on the part of the bank upon which it is drawn, except to pay it when presented out of the funds in its hands to the credit of the drawer, whereas a cashier's check, a certified check, or a draft are the absolute obligations of the bank issuing them."

The majority opinion in that case holds that the defendant was innocent of any knowledge that the bank's funds had been appropriated for the satisfaction of the personal obligations of the cashier. In the concurring opinion of Judge HALLAM the following language is used:

"I am of the opinion that when an officer of a bank pays his own check, given for his own debt, out of the assets of the bank, without authority so to do, the person receiving the payment, *with knowledge that the assets of the bank are being used,* is chargeable with notice of the officer's want of authority to appropriate the bank's funds to his own use."

As the statement of facts does not disclose the actual situation in full, we are unable to reconcile the two positions taken in the majority and the concurring opinions. A careful consideration of the authorities on the law involved upon the subject will reveal the fact that the opinion in the *Pope Case* is contrary to the great weight of authority in this country.

Litigation is designed to promote justice. To dispense exact justice is oftentimes a difficult problem. Our sympathies naturally would be with the defendant in this case, but, in view of what has heretofore been said, we are convinced that the conclusions arrived at herein will best serve and promote the ends of justice.

The decision in this case is based upon the second count in the complaint, which is one for money had and received. While this is a legal action, it is based upon equitable principles, viz. that the defendant has received money from the plaintiff which in equity and conscience she should not retain. It is true Markgraf would be estopped in any event from making any claim whatsoever. The moneys that were paid in satisfaction of his individual debt were the moneys of the bank. To this money the defendant, in equity and justice, was not entitled. As to the bank, she was enriched by the receipt of this money, and therefore the plaintiff should recover.

We have carefully considered the learned and ingenious arguments of both counsel in this case. The subject has been exhaustively and ably treated. There are other arguments advanced by counsel for the defendant which we deem it unnecessary to consider, but upon mature reflection we have arrived at the conclusions herein indicated, which are to the effect that the judgment, for the reasons herein stated, must be affirmed.

*By the Court.*—It is so ordered.

CROWNHART, J. (*dissenting*). It is conceded that the defendant was wholly innocent of any knowledge of any misconduct on the part of the cashier. We therefore have a confiding customer of the bank, who entered the bank for two perfectly lawful transactions. The first was to collect her note against the cashier. This was a purely private transaction with the cashier in his private capacity. Second, she wished to pay her note to the bank, and this was business with the bank. She received payment of the cashier by accepting the cashier's personal check on the plaintiff bank for the amount. Then, for the time being, she had completed her business with the cashier in his personal capacity. She then attended to her business with the bank. She announced

to the bank's chief executive officer that she wished to pay her note to the bank. She indorsed the check she had received from the cashier, and tendered it to the bank in payment of her note to the bank, and for deposit of the balance that would be due her. The bank, through its executive officer, accepted the check, gave the defendant her note due the bank, duly paid, and credited the balance on her bank pass-book. That completed the two transactions, and for six months she rested secure that the whole matter was closed, having had no notice to the contrary.

But it then appeared that the check was in fact worthless because the drawer had no funds in the bank. The check, however, was a negotiable instrument, to which the law of negotiable instruments applies. One who negotiates to a bank a check which turns out to be worthless may be held on her indorsement of the check, provided that she be promptly notified of its dishonor. Defendant was not so notified. The bank seeks to excuse its failure by alleging the fraud of its own executive officers, through no fault of the defendant, however. But such misconduct is no defense. The misconduct was the misconduct of the bank. The situation is no different than it would have been if defendant had presented a check of a stranger to the bank, payable to her and by her indorsed. If the check should not be paid by the maker, the defendant would be liable as an indorser.

The bank seeks to make a distinction by going back of the transaction of the defendant with the bank, and making the claim that, because defendant had accepted in payment of her note against the cashier a worthless check, therefore she obtained money from the bank for which she gave no consideration, and in equity she should return the money so received. The bank would ignore the law of negotiable instruments, specially applicable to the banking business. No legal sophistry should make the defendant responsible for the frauds of the bank's executive officer in doing the busi-

ness of the bank in such capacity. The bank employed the cashier. The bank held him out to its customers as trustworthy. The bank gave him the power and authority to accept checks drawn on the bank, either in payment of debts or in exchange for cash or credit. That is banking business, and banks are responsible for the acts of their officers in the regular course of their business.

The court has expressed some concern for the banking public if officers of the bank may defraud the bank in this manner. The defendant is one of the banking public. If she may be defrauded by crooked banking officials, over whom she has no control, then customers of a bank are never safe in dealing with a bank. The bank may amply protect itself by requiring its officers to give bonds to carry out their trust. If they neglect this precaution their negligence should not be visited on innocent customers. Of course, the bank claims the defendant, under the facts of this case, has lost nothing by the transaction for the reason that the cashier was insolvent and she could not have collected her note against him. This is by no means established. Had the check been promptly protested, it cannot be said that relatives or friends would not have come to his aid and defendant would have been paid. Such conditions are of common occurrence, of which we must take judicial knowledge. At any rate the bank's duty was to give her prompt notice of dishonor of the check, and leave her to pursue such remedies as she chose. Where one of two innocent parties must suffer, the one guilty of negligence must accept the loss.

It should be here noted that the cashier of the bank in this case was in fact the bank, as he was in full charge thereof. *Stevenson v. Columbia Bank of Lodi,* 197 Wis. 268, 221 N. W. 753.

I therefore respectfully dissent.

ESCHWEILER, J., joins herein.